*Soto v. Disney Severance Pay Plan, et al.*

# In the
# United States Court of Appeals
## For the Second Circuit

August Term, 2020

(Argued: June 22, 2021     Decided: February 16, 2022)

Docket No. 20-4081

NANCY J. SOTO,

*Plaintiff–Appellant*,

–v.–

DISNEY SEVERANCE PAY PLAN, INVESTMENT AND ADMINISTRATIVE
COMMITTEE OF THE WALT DISNEY COMPANY SPONSORED QUALIFIED BENEFIT
PLANS AND KEY EMPLOYEES DEFERRED COMPENSATION AND RETIREMENT
PLAN, THE WALT DISNEY COMPANY,

*Defendants–Appellees*.*

B e f o r e :

CARNEY, SULLIVAN, and BIANCO, *Circuit Judges*.

---

* The Clerk of Court is directed to amend the caption to conform to the above.

Plaintiff-Appellant Nancy J. Soto, a former employee of The Walt Disney Company ("Disney"), alleges that Disney improperly denied her severance benefits upon her termination for physical illness that rendered her unable to work. She brings claims against Defendants-Appellees Disney, the Disney Severance Pay Plan, and the Plan Administrator, under Section 502(a)(1)(B) & (a)(3) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B) & (a)(3), alleging that the Plan Administrator improperly determined that she did not experience a qualifying "Layoff" as required for severance benefits. We conclude that, because the operative Amended Complaint does not plausibly allege that the interpretation of "Layoff" and resulting denial of severance benefits to Soto were arbitrary and capricious, the District Court (Nathan, *J.*) did not err in dismissing Soto's claims.

AFFIRMED.

Judge Sullivan dissents in a separate opinion.

————————

DAVID S. PREMINGER, Keller Rohrback L.L.P., New York, NY, *for Plaintiff-Appellant*.

SHAILEE DIWANJI SHARMA (Andrew A. Ruffino, Robert S. Newman, *on the brief*), Covington & Burling LLP, New York, NY & Washington, D.C., *for Defendants-Appellees*.

————————

CARNEY, *Circuit Judge*:

Plaintiff-Appellant Nancy J. Soto is a former employee of The Walt Disney Company ("Disney"). After a stroke and other serious medical issues left her unable to work, Disney terminated her employment. Although Disney paid Soto disability benefits, it did not pay her severance benefits under the Disney Severance Pay Plan (the "Plan"). The Plan Administrator—the Investment and Administrative Committee of

2

The Walt Disney Company Sponsored Qualified Benefit Plans and Key Employees Deferred Compensation and Retirement Plan (the "Committee")—determined that Soto was ineligible for severance because she had not experienced a qualifying "Layoff" as defined in the Plan. Soto subsequently brought claims against Defendants-Appellees Disney, the Plan, and the Plan Administrator under Section 502(a)(1)(B) & (a)(3) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B) & (a)(3). She alleges that the Plan Administrator improperly denied her severance by deciding that, as defined by the Plan, a "Layoff" excluded a termination based on disability. We conclude that the Amended Complaint does not plausibly plead that this interpretation of "Layoff" and the resulting denial of severance benefits to Soto were arbitrary and capricious. The District Court therefore did not err in dismissing the claims. We accordingly affirm its judgment.

## BACKGROUND

### I.  ERISA § 502(a)(1)(B) & (a)(3)

Section 502 of ERISA authorizes "participant[s]" in an employee benefit plan to bring a civil action (i) "to recover benefits due to [them] under the terms of [their] plan," *see* ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), and (ii) "to obtain other appropriate equitable relief . . . to redress . . . violations or . . . enforce any provisions of" ERISA or "the terms of the plan," *see* ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3). A qualifying "plan" subject to ERISA is any "employee welfare benefit plan or an employee pension benefit plan." 29 U.S.C § 1002(3). There is no dispute that ERISA governs the Plan.

## II.    Soto's Complaint[1]

In 2019, Soto brought suit against Disney, the Plan, and the Plan Administrator after her claim for severance benefits was denied.[2] The operative Amended Complaint (the "Complaint") asserted two sets of claims relevant on appeal: first, that Soto was due a severance payment of $44,277 under the Plan, *see* ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B) (Counts I and II); and second, that the Plan language should be reformed to conform with certain requirements of ERISA, *see* ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3) (Count V). On appeal, Soto does not challenge the dismissal of the other counts of the Complaint.

The Complaint alleges that Soto was a longtime employee of Disney. In 2016 and 2017, she experienced a severe stroke and other medical problems, which left her disabled and unable to work. In January 2018, Disney formally terminated Soto's employment. Although Disney paid Soto sick pay, short-term illness benefits, and long-term disability benefits, it did not pay her severance benefits under the Plan. In June 2018, Soto applied for Plan benefits. Soto's application was denied because she was deemed not to have experienced a qualifying "Layoff" as required for Plan eligibility.

---

[1] On appeal from a grant of a motion to dismiss, we draw the factual narrative from the Amended Complaint, materials incorporated by reference into the complaint, and matters of which judicial notice may be taken, including relevant statutes and regulations. *See Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016).

[2] Although the Complaint includes unidentified members of the Committee as defendants, these John Does are not parties to this appeal. For convenience, we refer to Defendants-Appellees as "Defendants."

A.    The Plan Terms

The Plan is incorporated by reference into the Complaint. It "provides severance benefits" to "Eligible Employees" of the Plan "Sponsor," Disney. App'x at 26, 38. To qualify for these benefits, individuals must satisfy three conditions: they must (1) be an "Eligible Employee," (2) be notified in writing that they are a Plan "Participant," and (3) have experienced a "Layoff." *Id*. at 29.

The Plan defines "Layoff" as:

> The involuntary termination of employment of an Eligible Employee from the Company, except for reasons of poor performance or misconduct as determined by the Company [Disney] in its sole and absolute discretion. Notwithstanding the foregoing, in no event will an involuntary termination of employment be considered a Layoff if such involuntary termination does not qualify as a "separation of service" within the meaning of Section 409A of the Code and Treasury Regulation 1.409A-1(h).

*Id*. at 28.

The Plan confers discretion on the Plan Administrator to interpret and apply Plan terms. Section 8(b) of the Plan ("Plan Interpretation and Benefit Determination") explains:

> The Plan is administered and operated by the Plan Administrator, who has complete authority, in its sole and absolute discretion, to construe the terms of the Plan (and any related underlying documents or polices), to interpret applicable law, to make findings of fact and to determine the eligibility for, and amount of, benefits due under the Plan to Participants[.]

*Id*. at 36. Other sections of the Plan set out standards for how the Plan Administrator should exercise its discretion in construing Plan terms. For instance, Section 4(g) ("Integration With Other Payments") states that:

> benefits under this Plan are not intended to duplicate such benefits as workers' compensation[,] wage replacement benefits, disability benefits, pay-in-lieu-of-notice, severance pay, or similar benefits under other

> benefit plans . . . . Should such other benefits . . . be payable, benefits payable to a Participant under this Plan will be offset . . . . [T]he Plan Administrator, in its sole discretion, will determine how to apply this provision and may override other provisions of this Plan in doing so.

*Id*. at 32.

Section 7(h)(iv) ("General 409A Compliance") explains that severance benefits paid under the Plan are not intended to be taxable deferred compensation to the employee pursuant to Section 409A of the Internal Revenue Code. *See* 26 U.S.C § 409A(a)(1) (treating as taxable certain "deferred" compensation under employer benefit plans). To that end, the Plan Administrator is directed to interpret Plan terms in conformance with Section 409A and its exemptions from taxation:

> [I]t is intended that the Plan comply with the provisions of section 409A of the Code, and the Plan shall be construed and applied by the Plan Administrator in a manner consistent with this intent. Any provision that would cause any amount payable under the Plan to be includible in the gross income of a[n] Employee under section 409A(a)(1) of the Code shall have no force or effect.

App'x at 35; *see*, *e.g.*, 26 C.F.R. § 1.409A-1(b)(9)(iii) (Section 409A regulation providing that, where a "separation pay [i.e., severance] plan . . . provides for separation pay only upon an *involuntary* separation from service," payments under that plan are not taxable "defer[red] compensation" under Section 409A (emphasis added)).

Reflecting the principle that the Plan should conform with Section 409A, the definition of "Layoff" expressly incorporates a Section 409A regulation defining "separation from service": "[I]n no event will an involuntary termination of employment be considered a Layoff if such involuntary termination does not qualify as a 'separation of service'" under 26 C.F.R § 1.409A-1(h). App'x at 28. "Separation from service" in turn is defined under that regulation as a "termination of employment" in which "the employer and employee reasonably anticipate[] that no further services would be performed." 26 C.F.R. § 1.409A-1(h)(1)(i)-(ii). A related Section 409A

6

regulation, 26 C.F.R. § 1.409A-1(n)(1), defines an "*involuntary* separation from service" as a "separation from service [i.e., a termination of employment] due to the independent exercise of the unilateral authority of the" employer "where the [employee] was willing and able to continue performing services." *Id.* (emphasis added).

### B. Denial of Soto's Claim for Severance

Soto's claim for severance benefits was denied in two letters incorporated by reference into the Complaint. In the first letter, dated August 13, 2018, the Plan Administrator determined that Soto had not met two of the three eligibility requirements under the Plan: she had neither experienced a qualifying "Layoff" nor received notice that she was a Plan "Participant" because she did not satisfy the "Layoff" requirement. *See* App'x at 79. The Plan Administrator explained that Soto's termination based on an "inability to return to work on account of her disabling illness" fell outside the Plan definition of "Layoff." *Id.* It further explained that, while these circumstances qualified Soto to receive sick pay, short-term illness benefits, and long-term disability benefits, they did not qualify her to receive severance benefits under the Plan terms.

In the second letter, dated November 21, 2018, a Subcommittee of the Plan Administrator upheld the denial of severance benefits. The Subcommittee agreed with the Plan Administrator's reasoning in the prior letter that Soto had not experienced a qualifying "Layoff" or received notice that she was a Plan "Participant." As the second letter explained, because "Ms. Soto's employment with the Company ended on account of her inability to return to work following a disabling illness," such "circumstances did not constitute a 'Layoff' for purposes of Plan eligibility." *Id*. at 41. Nor did Soto "meet the separate requirement for Plan eligibility in that she was never informed in writing by the Company that the circumstances of her separation of employment qualified her

7

for Plan benefits." *Id.*

## C. Soto's Theory of the Case

The Complaint pleads both claims for damages and equitable relief. Soto first alleges that she is entitled to severance benefits of approximately $44,277, arguing that the Plan Administrator erred in concluding that she did not meet the "Layoff" or notice eligibility requirements (Counts I and II). App'x at 48, 50; *see also id.* at 54 (Am. Compl. ¶ 45). With respect to the "Layoff" requirement, the Complaint alleges that "Plaintiff's Termination was a 'Layoff' within the Plan's unambiguous definition of that term. Alternatively, if the term Layoff is found to be ambiguous, Defendants' interpretation of the term Layoff is arbitrary and capricious." *Id.* at 50 (Am. Compl. ¶ 23); *see also id.* at 51, 53 (Am. Compl. ¶¶ 34, 41). With respect to the notice requirement, the Complaint pleads that, because Soto did not receive notice solely on the ground that she had not experienced a "Layoff," "Disney must notify her of her entitlement to benefits" under a correct interpretation of that term. *Id.* at 50 (Am. Compl. ¶ 26). In the alternative, Soto seeks equitable relief (Count V) to "reform" the Plan "to comply with ERISA['s]" requirements that a plan contain certain information and be written in a manner for the average participant to understand, as well as with "Plaintiff's reasonable understanding of [the Plan] terms." *Id.* at 55 (Am. Compl. ¶ 57). The Complaint alleges that "as reformed[,] Plaintiff should be granted benefits" under the Plan. *Id.* (Am. Compl. ¶ 57).

## III. Procedural History

Soto filed this action in May 2019. After Defendants moved to dismiss the original complaint, but before that motion was adjudicated, Soto amended her complaint. Defendants moved again to dismiss. As the parties were briefing that second motion, Soto filed the operative Complaint, which the District Court deemed the subject of the pending motion to dismiss.

On November 9, 2020, the District Court granted Defendants' motion to dismiss. *See Soto v. Disney Severance Pay Plan*, No. 19 Civ. 4048, 2020 WL 6564721 (S.D.N.Y. Nov. 9, 2020).[3] The District Court held that "Plaintiff has pled herself out of court" because the Complaint "admits" that Soto did not receive notice of her eligibility under the Plan as required for severance benefits. *Id.* at *3. Because the absence of such notice was sufficient for dismissal, the District Court did not reach the separate issue of whether Soto had plausibly alleged that the Plan Administrator erred in concluding she did not experience a qualifying "Layoff." *Id.* at *7. Soto timely appealed.

## DISCUSSION

We review *de novo* the grant of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). *Testa v. Becker*, 910 F.3d 677, 682 (2d Cir. 2018). Although we "accept[] all factual allegations in the complaint as true and draw[] all reasonable inferences in the plaintiff's favor," *id.*, we must dismiss a claim if a plaintiff "plead[s] himself out of court by alleging facts which show that he has no claim," *Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP* (*Color Tile*), 322 F.3d 147, 167 (2d Cir. 2003). "We may affirm on any ground the record supports, and are not limited to the reasons expressed by the district court." *Laurent v. PricewaterhouseCoopers LLP*, 794 F.3d 272, 273 n.1 (2d Cir. 2015).

### I. Soto's Claims for Benefits (Counts I and II)

We affirm the dismissal of Soto's claims for severance benefits under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), but for a different reason than relied on by the

---

[3] Unless otherwise noted, in quotations from case law, this Opinion omits all alterations, brackets, citations, emphases, and internal quotation marks.

9

District Court.[4] We conclude that the Complaint does not plausibly allege that the Plan Administrator was arbitrary and capricious in denying Soto severance benefits on the ground that she did not experience a qualifying "Layoff." To the contrary, the Complaint pleads facts evincing that the Plan Administrator's determination was reasonable and must be upheld. *See Color Tile*, 322 F.3d at 167 (requiring dismissal where plaintiff "alleg[es] facts . . . show[ing] that he has no claim").

A. The Complaint Pleads the Conditions Triggering Arbitrary and Capricious Review of the Plan Administrator's Decisions

We begin by explaining why Soto's claims are subject to an arbitrary and capricious standard. It has long been established under ERISA that, "where (as in this case) the relevant plan vests its administrator with discretionary authority over benefits decisions . . . the administrator's decisions may be overturned only if they are arbitrary and capricious." *Roganti v. Metro. Life Ins. Co.*, 786 F.3d 201, 210 (2d Cir. 2015). Thus, arbitrary and capricious review is proper for decisions involving the exercise of the administrator's discretion, as when it interprets ambiguous plan terms. But when an administrator is interpreting unambiguous plan terms, we generally apply a *de novo* standard of review because "unambiguous language leaves no room for the exercise of discretion." *O'Neil v. Ret. Plan for Salaried Emps. of RKO Gen., Inc.*, 37 F.3d 55, 59 (2d Cir. 1994).

---

[4] As discussed, the District Court dismissed Soto's claims because the Complaint concedes that Soto did not receive notice of eligibility. *See Soto*, 2020 WL 6564721, at *3. But Soto's theory is that Defendants *improperly* withheld notice under an incorrect view that she did not experience a "Layoff." At bottom, Soto's claims turn on the propriety of the Plan Administrator's interpretation of "Layoff." Accordingly, we must decide whether the Complaint plausibly alleges that this interpretation, and the consequent denial of severance benefits to Soto, were improper.

10

The Complaint and materials that it incorporates by reference show that the Plan Administrator is vested with the discretion to determine whether an employee experienced a qualifying "Layoff" and is eligible for severance benefits. Section 8(b) of the Plan contains the unequivocal language conferring this discretion: the Plan is "administered and operated by the Plan Administrator, *who has complete authority, in its sole and absolute discretion*, to construe the terms of the Plan . . . , to interpret applicable law, to make findings of fact and to determine the eligibility for, and amount of, benefits due under the Plan[.]" App'x at 36 (emphasis added); *see, e.g., Roganti*, 786 F.3d at 205 n.2 (finding sufficient for conferral of discretion plan language that authorizes administrator to "determine[] in its discretion that the applicant is entitled to" benefits).

We further conclude that the term "Layoff" is ambiguous, thereby requiring the Plan Administrator to use its discretion to determine whether the term applies in Soto's circumstances. "Whether [plan] language is ambiguous is a question of law" for the court, turning on whether the language is reasonably "capable of more than one meaning" within the "context of the entire" plan. *Fay v. Oxford Health Plan*, 287 F.3d 96, 104 (2d Cir. 2002).

The Plan defines "Layoff" as "[t]he involuntary termination of employment . . . except for reasons of poor performance or misconduct as determined by the Company [Disney] in its sole and absolute discretion," subject to a substantive limitation: that, "[n]otwithstanding the foregoing" general definition, the phrase "involuntary termination of employment" may in no event "be considered a Layoff if such involuntary termination does not qualify as a 'separation of service' within the meaning of Section 409A of the Code and Treasury Regulation 1.409A-1(h)." *See* App'x at 28; 26 C.F.R. § 1.409A-1(h)(1)(i)-(ii) (defining "termination of employment" as the circumstance when "the employer and employee reasonably anticipated that no further

11

services would be performed"). Consistency with this regulation is therefore a necessary condition for identifying a qualifying "Layoff."

It is not, however, a sufficient condition because the Plan further leaves the phrase "*involuntary* termination of employment" undefined. We find this phrase ambiguous as to whether it embraces a termination based on disability. On the one hand, an "involuntary termination" may be interpreted broadly to mean any circumstance in which an employee does not affirmatively choose to leave work but is forced to do so by external circumstances, such as physical disability. *See*, *e.g.*, *Involuntary*, Oxford English Dictionary Online, https://www.oed.com/viewdictionaryentry/Entry/99193 (defining "involuntary" as "not done . . . by choice"). But on the other hand, the phrase may reasonably be interpreted more narrowly to refer to circumstances in which an employee would otherwise continue working but for the termination forced upon her by the employer. Such a termination is "involuntary" because it is opposed to the employee's choice to continue working. Implicit in the employee having such a choice is that she is able to continue working. This second interpretation is narrower than the first because the obstruction to the employee's choice is not *any* external circumstance, but a circumstance mainly within the employer's own control and discretion.

Considering an "involuntary termination" in the "context of the entire" Plan reinforces this ambiguity. *See Fay*, 287 F.3d at 104 ("Language is ambiguous when it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire agreement."). Section 7(h)(iv) of the Plan instructs that the Plan "shall be construed and applied by the Plan Administrator in a manner consistent with" "the provisions of section 409A of the [Internal Revenue] Code." App'x at 35. A regulation promulgated under Section 409A, 26 C.F.R. § 1.409A-1(n)(1), defines an "involuntary" "termination of employment" as one arising from "the

12

independent exercise of the unilateral authority of the [employer] to terminate the [employee's] services, . . . where the [employee] was willing *and able* to continue performing services."[5] *Id*. (emphasis added). So, notwithstanding the broad meaning that an "involuntary termination of employment" might bear, this regulation—with which the Plan requires the Plan Administrator to comply in construing Plan terms, *see* App'x at 35—supports the narrower interpretation that the phrase excludes a termination based on disability.

Further reinforcing the view that the phrase, considered in context, is ambiguous is Section 4(g) of the Plan ("Integration With Other Payments"). *Id*. at 32. In outlining Plan benefits, Section 4(g) provides that "benefits under this Plan are not intended to duplicate . . . disability benefits." *Id.* This provision suggests that an "involuntary termination" excludes a termination arising from disability. But Section 4(g) also provides a mechanism for offsetting Plan benefits by any amounts paid for certain listed benefits, including disability benefits: "[B]enefits under this Plan are not intended to duplicate such benefits as workers' compensation[,] wage replacement benefits, disability benefits, pay-in-lieu-of-notice, severance pay, or similar benefits under other benefit plans . . . . Should such other benefits . . . be payable, benefits payable to a Participant under this Plan will be offset." *Id.* This offset mechanism might suggest that the Plan covers terminations based on disability and anticipates offsetting such benefits in the event that similar disability benefits are paid out under other plans. Alternatively, however, the offset mechanism might simply be a failsafe to prevent overlap between Plan benefits and certain other listed benefits that are more likely to be duplicative than

---

[5] Regulation 1.409A-1(n) defines an "involuntary separation from service," and a "separation from service" in turn is defined as a "termination of employment." 26 C.F.R. § 1.409A-1(h)(1)(i)-(ii) & (n)(1). Thus, Regulation 1.409A-1(n) in effect is defining an "involuntary termination of employment"—the same phrase found in the Plan definition of "Layoff."

disability benefits, such as "severance pay . . . under other benefits plans [and] severance programs." *Id*. Indeed, Section 4(g) sets out an illustrative list of benefits, including disability benefits, to identify them as benefits that the Plan is *not* intended to duplicate. But the offset mechanism refers back to this whole list for ease, even though the list may be overinclusive of the types of benefits that the offset mechanism is expected to cover. Section 4(g) therefore reasonably may be read to cut either for or against the Plan's coverage of termination based on disability.

In light of the ambiguity of "Layoff" read as defined by the Plan and in the overall context of the Plan, the Complaint evinces that the Plan Administrator must exercise its discretion in construing this term, and its interpretation is subject to arbitrary and capricious review.[6]

---

[6] Our dissenting colleague would find the terms "Layoff" and "involuntary termination" unambiguous as used in the Plan. For the reasons set out in the text, we respectfully disagree. The incorporation of Section 409A terms, regulations, and constraints into the Plan's directives with regard to determining qualifying "Layoffs" is not as straightforward as the Dissent conceives. These embedded references to multi-layered provisions of the Internal Revenue Code effectively remove the relevant Plan terms from the type of "plain meaning" analysis for which the Dissent advocates; they create ambiguity and commit interpretation and application of the operative Plan provisions to the discretion of the Plan Administrator. Further, although the Dissent points out hypothetical circumstances in which the Plan administrator might deny an applicant's request for severance pay under the interpretations adopted here, we think the hypothetical is overdrawn: factual differences that would emerge in a real life scenario could well diminish the likelihood of such anomalous results, in the exercise of the Plan Administrator's reasoned discretion. Finally, the dissent acknowledges that the Plan's benefit offset provisions also likely mean that the ultimate result for Soto of our Court's adopting the dissent's "no-ambiguity" approach probably "wouldn't amount to much" and would be a "pyrrhic victory." Dissent at 9. To us, this recognition offers further confirmation that our reading of the Plan is consistent with the general, overall intentions of the Plan as reflected in its language and as carried out by the Plan Administrator in Soto's case when it declined to provide her a notice of eligibility.

B.      The Complaint Pleads the Reasonable Bases for the Plan Administrator's Interpretation of "Layoff" and Denial of Severance Benefits

For the Complaint to state a claim upon which relief may be granted, it must plead that the Plan Administrator's interpretation of "Layoff" and consequent denial of severance benefits to Soto were arbitrary and capricious. *See Roganti*, 786 F.3d at 201, 211, 217 (explaining that arbitrary and capricious review entails "assessing the reasonableness" of an administrator's decision in a "highly deferential" manner such that a decision may be overturned only if it is "without reason, unsupported by substantial evidence or erroneous as a matter of law"). Far from pleading that the Plan Administrator's determinations were without reason, the Complaint and incorporated materials evince the reasoned bases for the determinations. As a result, Soto does not have a viable claim.

The pleadings demonstrate that the Plan Administrator reasonably interpreted "Layoff" to exclude a termination based on disability consistent with Section 409A of the Internal Revenue Code. As discussed, Section 7(h)(iv) of the Plan (entitled "General 409A Compliance") mandates that Plan terms be interpreted to "comply with the provisions of [S]ection 409A of the [Internal Revenue] Code." App'x at 35. Regulation 1.409A-1(n)(1), promulgated to effectuate Section 409A, in turn defines an "involuntary" "termination of employment"—the same phrase in the definition of "Layoff"—as *excluding* a termination based on disability: such a termination occurs only when an employee who "was willing and *able to continue performing services*" is terminated by the employer's "unilateral authority." 26 C.F.R. § 1.409A-1(n)(1) (emphasis added).[7] Because the Plan requires compliance with Section 409A, the Plan

---

[7] Soto argues that because the definition of "Layoff" expressly references only Regulation 1.409A-1(h)(1) (defining "termination of employment") and not Regulation 1.409A-1(n)(1) (defining "involuntary" termination of employment), we cannot consider the latter

Administrator acted reasonably in selecting an interpretation of "Layoff" consistent with this section.

The Plan makes clear that this consistency is important to ensure that severance benefits are not deemed taxable "deferred" compensation under Section 409A, 26 U.S.C § 409A(a)(1). As the Plan instructs, "[a]ny provision that would cause any amount payable under the Plan to be includible in the gross income of a[n] Employee under section 409A(a)(1) of the Code shall have no force or effect." App'x at 35. Thus, the Plan "shall be construed and applied by the Plan Administrator in a manner consistent with this intent." *Id.* Significantly, Section 409A regulations exempt from taxation certain benefit payments, and the applicability of such exemptions turns on whether the benefits are paid upon an "involuntary separation from service [i.e., termination of employment]." *See, e.g.*, 26 C.F.R. § 1.409A-1(b)(4) & (d)(1) (exempting from taxation benefits that are paid within a certain timeframe defined with reference to whether there was an "involuntary separation from service")[8]; *see also id.* § 1.409A-1(b)(9)(iii)

regulation in interpreting "Layoff." *See* 26 C.F.R. § 1.409A-1(h)(1)(ii) & (n)(1). This argument is without merit. The Plan Administrator is directed to ensure that Plan terms conform with Section 409A overall, not just with Regulation 1.409A-1(h)(1) referenced in the definition of "Layoff." *See* App'x at 35. Furthermore, the definition of "Layoff" requires that an "involuntary termination of employment" be interpreted at a minimum consistent with the meaning of "termination of employment" in Regulation 1.409A-1(h)(1). But the definition in no way permits the Plan Administrator to ignore other Section 409A regulations, particularly not the highly relevant interpretation of an "involuntary" termination of employment in Regulation 1.409A-1(n)(1).

[8] As Disney explains, the Plan is designed to conform with this "short-term deferral" exemption in 26 C.F.R. § 1.409A-1(b)(4), applying to benefits paid within a short timeframe after the benefits vest and are no longer subject to "a substantial risk of forfeiture." *See* Disney Br. at 23-24 n.7. At what point there is no longer a "substantial risk of forfeiture" depends on whether severance benefits are paid upon an "involuntary separation from service." 26 C.F.R. § 1.409A-1(d)(1). Consequently, proper application of the short-term deferral exemption turns on interpreting "involuntary separation from service" in a way that is consistent with Regulation 1.409A-1(n)(1).

(exempting from taxation certain severance benefits that are paid "only upon an involuntary separation from service"). Such provisions highlight the necessity for the Plan Administrator to interpret an "involuntary" termination of employment consistently with Section 409A to ensure that Plan benefits will receive the intended tax treatment under the Plan.

Because we conclude that the Plan Administrator had reasoned bases for its interpretation of "Layoff" and consequent denial of severance benefits, Soto's claims challenging the denial of these benefits are not viable. *See Roganti*, 786 F.3d at 217 (an administrator's "decision is intended to be final—within the bounds of the highly deferential arbitrary-and-capricious standard—and not merely an input with the potential to assist the Court in making the ultimate determination" of eligibility). We affirm the dismissal of these claims.

## II.    Reformation Claim (Count V)

We also affirm the dismissal of Soto's reformation claim in Count V. Section 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), authorizes a plan "participant, beneficiary, or fiduciary . . . to obtain . . . appropriate equitable relief," including reformation of a severance benefits plan. *See Laurent v. PricewaterhouseCoopers LLP*, 945 F.3d 739, 748 (2d Cir. 2019) (Section "502(a)(3) authorizes district courts to grant equitable relief—including reformation—to remedy violations of subsection I of ERISA, even in the absence of mistake, fraud, or other conduct traditionally considered to be inequitable.").

As we found in the prior section, Soto has not plausibly alleged that she is a Plan "participant" entitled to bring a claim for equitable relief. 29 U.S.C. § 1132(a)(3). This is because she has not plausibly alleged that the Plan Administrator acted arbitrarily or capriciously in determining that she failed to meet the eligibility requirements for Plan participation. Nor has Soto claimed to be a "beneficiary" or "fiduciary" of the Plan.

17

Accordingly, under the plain terms of Section 1132(a)(3), Soto does not have a viable claim for reformation.

## CONCLUSION

We have considered Soto's remaining arguments on appeal and find in them no basis for reversal.[9] The judgment of the District Court is **AFFIRMED**.

---

[9] In light of Soto's previous opportunities to amend her pleading and the bases for our decision, permitting further amendment of the Complaint would be futile. We accordingly deny Soto's request for leave to further amend. *Chunn v. Amtrak*, 916 F.3d 204, 208 (2d Cir. 2019) ("Leave to amend may be denied if the proposed amendment would be futile.").

RICHARD J. SULLIVAN, Circuit Judge, dissenting:

I respectfully disagree with the majority's interpretation of the term "Layoff" in the Plan documents. In my view, the Plan's definition of "Layoff" is clear and unambiguous, and includes terminations due to disability. It therefore follows that the Plan Administrator's decision to withhold notice stating that Soto was a Plan Participant – a decision based solely on the Plan Administrator's determination that Soto's termination was not a Layoff – was arbitrary and capricious, and that the subsequent denial of Soto's benefits was also arbitrary and capricious. Accordingly, I would vacate the district court's judgment and remand for further proceedings.

The basic facts and procedural history of this case are not in dispute. Soto is a former employee of the Walt Disney Company. In 2016 and 2017, she suffered significant medical problems, including a severe stroke, that left her disabled and unable to work. Disney placed Soto on "leave of absence status" on December 8, 2016, and Soto received sick pay and short-term illness benefits from December 10, 2016 to March 18, 2017. In March 2017, Soto qualified for and began to receive long-term disability benefits under a separate Disney plan because she was no longer able to perform her job function. In January 2018, Disney terminated Soto's

employment because of "her inability to return to work on account of her disabling illness." App'x at 45 (internal quotation marks omitted).

In June 2018, Soto applied for severance benefits under the Plan. Soto's claim was denied because the Plan Administrator determined that the termination of her employment did not constitute a Layoff within the meaning of the Plan. Soto appealed that denial, which was upheld on the grounds that the termination of Soto's employment did not constitute a Layoff and, separately, that Soto was not eligible under the Plan because she was never informed in writing by the Plan Administrator that her separation of employment qualified her for Plan benefits.

To be eligible for severance benefits under the Plan, an employee must (i) be an Eligible Employee, as defined by the Plan; (ii) be specifically informed in writing that she is a Plan Participant; and (iii) have experienced a Layoff as that term is defined in the Plan. The parties agree that Soto is an Eligible Employee and that only the Layoff requirement and the notice requirement are at issue in this case.

Layoff is defined in Section 2(*l*) of the Plan as:

> The involuntary termination of employment of an Eligible Employee from the Company, *except for reasons of poor performance or misconduct* as determined by the Company in its sole and absolute discretion.

2

> Notwithstanding the foregoing, in no event will an involuntary termination of employment be considered a Layoff if such involuntary termination does not qualify as a "separation of service" within the meaning of Section 409A of the Code and Treasury Regulation Section 1.409A-1(h).

App'x 28 (emphasis added). In other words, a Layoff under the Plan is any involuntary termination except for cause.

The Plan's definition of Layoff is remarkably capacious, and even Disney concedes that a termination due to disability does not constitute a termination due to poor performance or misconduct. *See* Oral Argument at 21:30–21:55. Disney instead insists – as the Plan Administrator did when denying Soto benefits in 2018 – that "[a] layoff occurs under the Plan when there is a separation from the Company in the context of situations similar to a job elimination, reduction in force[,] or geographic relocation of the place of employment." App'x at 79; Disney Br. at 21. To state the obvious, this interpretation of Layoff is completely atextual and injects limitations – pertaining to job eliminations, reductions in force, and geographic relocation – that are nowhere found in the language of the Plan itself. Perhaps not surprisingly, the majority makes no attempt to defend this interpretation of Layoff, even though it is the one that the Administrator actually relied on in denying Soto benefits under the Plan.

3

But while the majority distances itself from the interpretation advanced by Disney, it nevertheless holds that the seemingly clear definition of Layoff provided by the Plan's lexicon is in fact murky. In particular, the majority seizes on the phrase "involuntary termination" and suggests that this phrase could mean either (i) "any circumstance in which an employee does not affirmatively choose to leave work but is forced to by external circumstance, such as physical disability" or (ii) "circumstances in which an employee would otherwise continue working but for the termination forced upon her by the employer." Maj. Op. at 12. This strained reading – which defies both logic and common sense – ultimately fares no better than Disney's wholesale rewriting of the term. As the Plan language makes clear, a Layoff is an act, not a circumstance. It therefore makes perfect sense that the Plan recognizes the difference between a voluntary termination, in which an employee chooses (or at least agrees) to end her employment, and an involuntary one, in which the employer acts unilaterally. The former category does not entitle one to severance benefits, and the latter category does, *except for reasons of poor performance or misconduct* as determined by the Company."

Soto clearly didn't choose to end her employment with Disney; she was terminated by the Company on short notice and without her consent. And since

4

even Disney concedes that she was not fired for poor performance or misconduct, it is hard to fathom how her termination does not fall under the Plan's straightforward definition of Layoff.

To be sure, the Plan makes clear that an involuntary termination of employment will not be considered a Layoff "if such involuntary termination does not qualify as a 'separation of service' within the meaning of Section 409A of the Code and Treasury Regulation Section 1.409A-1(h)." But nothing in either of those provisions suggests that Disney's firing of Soto was anything other than a "separation of service." To the contrary, the regulation cited in the Plan provides that "[a]n employee separates from service with the employer if the employee dies, retires, or otherwise has a termination of employment with the employer." 26 C.F.R. § 1.409A-1(h)(1)(i). And while it is true that an employee who "is on military leave, sick leave, or other bona fide leave of absence" will not be deemed to have separated from service, *id.,* it cannot be seriously argued that Soto was on leave – and therefore not separated from service at Disney – *after* her employment was terminated in January 2018.

The majority attempts to bypass the plain language of the Plan – and the statutory and regulatory provisions cited therein – by stitching together language

5

from several *other* regulations promulgated pursuant to Section 409A to define "involuntary termination of employment" as "the independent exercise of the unilateral authority of the [employer] to terminate the [employee's] services, . . . where the [employee] was willing *and able* to continue performing services." Maj. Op. at 13 (quoting 26 C.F.R. § 1.409A-1(n)(1)). But these regulations are neither acknowledged by nor incorporated into the Plan and therefore provide no basis for the majority's extra-textual new definition of Layoff.

The majority's new definition – which would make involuntary termination by the employer turn on the *employee's* condition – is also inconsistent with the very purpose of the Plan. By the majority's logic, if the Company had fired Soto five minutes before she had a stroke, she would be entitled to severance benefits; but if her firing had taken place five minutes *after* she had a stroke, she would be entitled to nothing. Again, the text of the Plan nowhere suggests, much less compels, such an interpretation, which would incentivize the Company to jettison employees any time they were "[un]*able* to continue performing services." Maj. Op. at 13. One might expect such a plan from the firm of Scrooge & Marley, but not from a company that proudly, and accurately, touts its "ongoing commitment to people with disabilities." DISNEY GARNERS PERFECT SCORE ON DISABILITY

6

EQUALITY INDEX, https://thewaltdisneycompany.com/disney-garners-perfect-score-on-disability-equality-index/ (last visited Dec. 3, 2021).

But if there truly were any doubt concerning whether Soto's termination constituted a Layoff under Section 2(*l*) of the Plan, it is resolved by the language of the Plan itself, which recognizes that disability and severance benefits are not mutually exclusive. In particular, Section 4(g) of the Plan, entitled "Integration with Other Payments," makes clear that severance benefits under the Plan "are not intended to duplicate such benefits as workers' compensation wage replacement benefits, *disability benefits*, . . . or similar benefits," and that "should such other benefits . . . be payable, benefits payable to a Participant under this Plan will be offset." App'x at 32 (emphasis added). The Plan therefore contemplates situations in which a Participant will collect both disability payments and severance payments, and provides that the latter will be deducted from, or offset by, the former. This provision would be unnecessary – and in fact nonsensical – if a termination due to disability were excluded from the definition of "Layoff."

Forced to acknowledge the plain language of Section 4(g), the majority endeavors to brush it aside by suggesting that the list "may be overinclusive." Maj. Op. at 14. But fundamental principles of contract interpretation require us to

7

assume "that no part of [an agreement] is superfluous;" instead, we must favor interpretations that are "reasonable" and give "effective meaning to all the [agreement's] terms" over interpretations "which leave[] a part . . . of no effect." Restatement (Second) of Contracts § 203(a), cmt. b (1981); *see also* Restatement (First) of Contracts § 236(a) (1932); 11 Williston on Contracts § 32:5 (4th ed.). We therefore cannot assume that Section 4(g)'s reference to disability benefits is mere surplusage, and instead are compelled to adopt a reading that gives effect to that language while harmonizing it with the rest of the Plan.

Because the Plan's definition of Layoff clearly covers terminations due to disability, it obviously follows that the Plan Administrator's decision to exclude Soto from severance benefits was arbitrary and capricious. *See McCauley v. First Unum Life Ins. Co.*, 551 F.3d 126, 133 (2d Cir. 2008). And since this erroneous decision drove the Administrator's refusal to issue a written notice that Soto was a Plan Participant – itself a prerequisite to receiving severance benefits, which the

8

district court relied on as an independent basis for dismissing Soto's complaint – I would remand to the district court to allow Soto to proceed with her claims.[1]

Of course, it is likely that those claims, if permitted to proceed, wouldn't amount to much. After all, Section 4(g) provides that severance benefits available under the Plan must be offset by any disability benefits previously provided to the employee. Given that Soto was placed on leave of absence status over a year before her termination, there is a high likelihood that she has already received disability benefits that approach or even exceed the severance benefits she is now seeking under the Plan. If so, the offset requirement in Section 4(g) would make reversal a pyrrhic victory. But the issue before us is a matter of contract interpretation, pure and simple, and based on the clear language of the Plan, the Administrator's denial of severance benefits was "erroneous as a matter of law"

---

[1] The district court also held that because Soto had "not argue[d] that the Court should review the Plan Administrator's decision not to send Soto notice" or that the Plan Administrator's decision not to send Soto notice was arbitrary and capricious, Soto had waived any such argument. *Soto v. Disney Severance Pay Plan*, No. 19-CV-4048 (AJN), 2020 WL 6564721, at *6 (S.D.N.Y. Nov. 9, 2020). But the Layoff argument and notice arguments are so intertwined as to be inseparable. Because the Administrator's decision to withhold notice was premised on his conclusion that Soto was ineligible for Plan benefits, I'm satisfied that Soto preserved both her Layoff and notice arguments.

and was therefore arbitrary and capricious. *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 442 (2d Cir. 1995). [2]

For all these reasons, I respectfully dissent.

---

[2] The majority affirms dismissal of Soto's claim for reformation for the same reason it affirms dismissal of Soto's claims for benefits – the conclusion that she was not a Plan Participant. While I disagree with that rationale, I would nevertheless affirm dismissal of Soto's reformation claim, since her complaint is silent as to which terms of the Plan need to be reformed and which provisions of ERISA those terms violate. *Cf. Laurent v. PricewaterhouseCoopers LLP*, 945 F.3d 739, 748 (2d Cir. 2019) (identifying "*terms violative of ERISA* as independent bases that justify the equitable remedy of reformation").